UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JASON MALDONADO,                       :

                    Plaintiff,         :      15 Civ. 4016 (HBP)

     -against-                         :      OPINION
                                              AND ORDER
CAROLYN W. COLVIN, ACTING              :
COMMISSIONER OF SOCIAL
SECURITY,                              :

                    Defendant.         :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.  Introduction


          Plaintiff Jason Maldonado brings this action pursuant

to Section 205(g) of the Social Security Act (the "Act"), 42

U.S.C. § 405(g), seeking judicial review of a final decision of

the Commissioner of Social Security (the "Commissioner") denying

his application for supplemental security income ("SSI").  The

parties have consented to my exercising plenary jurisdiction

pursuant to 28 U.S.C. § 636(c).  Plaintiff and the Commissioner

have both moved for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure.  For the reasons

set forth below, plaintiff's motion (Docket Item ("D.I.") 11) is

granted and the Commissioner's motion (D.I. 14) is denied.

II.  <u>Facts</u>[1]

    A.  <u>Procedural Background</u>

       Plaintiff filed an application for SSI on June 12, 2012, alleging that he had been disabled since December 1, 2011 (Tr. 70, 141-49).  Plaintiff completed a "Disability Report" in support of his claim for benefits (Tr. 158-66).  Plaintiff claimed that he was disabled due to bipolar disorder, an anxiety disorder, schizophrenia, depression and a lower back condition (Tr. 159).  Plaintiff reported that he took the following medications:  Abilify and Seroquel for schizophrenia, Ambien for insomnia, Atarax and Ativan for anxiety, Lexapro for anxiety and depression, Trazodone for depression and Oxycodone for back pain (Tr. 162).  Plaintiff also reported that he received psychological therapy and physical therapy for his conditions (Tr. 163).

       On September 26, 2012, the Social Security Administration (the "SSA") denied plaintiff's application, finding that he was not disabled (Tr. 71-76).  Plaintiff timely requested and was granted a hearing before an Administrative Law Judge (an "ALJ")

_____

    [1]I recite only those facts relevant to my resolution of the pending motion.  The administrative record that the Commissioner filed, pursuant to 42 U.S.C. § 405(g) (<u>see</u> SSA Administrative Record, dated July 16, 2015 (D.I. 9) ("Tr.")) more fully sets out plaintiff's medical history.

(Tr. 77-79).  ALJ Michael Friedman held a hearing on September 27, 2013 (Tr. 32-45).  The ALJ reviewed the claim de novo and, in a decision dated December 6, 2013, determined that plaintiff was not disabled within the meaning of the Act from June 12, 2012 to the date of the decision (Tr. 12-26).  The ALJ's decision denying benefits became final on March 27, 2015 when the Appeals Council denied plaintiff's request for review (Tr. 1-4).  Plaintiff commenced this action on May 26, 2015 seeking review of the Commissioner's decision (Complaint, filed May 26, 2015 (D.I. 1)).

      B.  Plaintiff's
         Social Background

      Plaintiff was born in 1978 and was 34 years old at the time he filed his application for SSI (Tr. 155).  He has an eighth grade education (Tr. 160) and previously worked as a barber's apprentice (Tr. 160-61).  He never worked for more than a few months at a time (Tr. 35, 160-61).

      At his hearing before the ALJ, plaintiff testified that he was homeless and moved around from place to place (Tr. 34-35).  He was staying with his cousin at the time of the hearing (Tr. 34).  Plaintiff further testified that his cousin helped him with grocery shopping because he was "very bad with prices and stuff, handling money" (Tr. 37-38).

Plaintiff also testified that he had limited cooking skills, cleaned "[b]asic things," enjoyed watching television and smoked one pack of cigarettes per day (Tr. 38).  Plaintiff also stated that he stopped using drugs about three years prior to the hearing and had one relapse (Tr. 39).

## C.  Plaintiff's Medical Background

### 1.  Physical Health Treatment Records

#### a.  AllMed and Rehabilitation of New York

Dr. Michael Pierce, M.D., evaluated plaintiff on May 7, 2012 (Tr. 498).  Plaintiff reported that he had chronic back pain as a result of a fall from a ladder in 2005 (Tr. 498).  Plaintiff also reported that his pain was moderate and intermittent and that it was aggravated by bending and sitting (Tr. 498).  Dr. Pierce noted that plaintiff walked with a cane and that plaintiff had a history of opioid dependence, for which plaintiff partici-pated in a methadone maintenance treatment program (Tr. 498, 500).  A physical examination of plaintiff did not reveal any abnormal findings (Tr. 500-01).  Dr. Pierce diagnosed plaintiff with opioid dependence, which was being treated by a methadone maintenance treatment program, a back contusion, tobacco abuse

4

and a chronic Hepatitis C infection (Tr. 501-02).  Dr. Pierce
referred plaintiff for pain management (Tr. 502).

Plaintiff returned to Dr. Pierce on May 16, 2012 with
complaints of low back pain that radiated to his right leg (Tr.
546).  An examination revealed pain with forward flexion (Tr.
546).  Dr. Pierce again diagnosed plaintiff with opioid depend-
ence, which was being treated by a methadone maintenance treat-
ment program,, a chronic Hepatitis C infection, chronic back pain
and a lumbar contusion (Tr. 546).  Dr. Pierce prescribed Percocet
(Tr. 546).

On June 7, 2012, Dr. Pierce noted that plaintiff walked
with a cane and that he had chronic low back pain that radiated
to the right leg (Tr. 543).  Dr. Pierce increased plaintiff's
dosage of Percocet and ordered a urine toxicology screening (Tr.
543).  Four weeks later, Dr. Pierce noted that plaintiff's urine
test was positive for "opiate" and "meth" (Tr. 621).  Dr. Pierce
diagnosed plaintiff with opioid dependence, which was being
treated by a methadone maintenance treatment program, cocaine
abuse that was in remission, a lumbar contusion and a chronic
hepatitis C infection (Tr. 621).

On July 25, 2012, pain management specialist Dr. Henry
Sardar, D.O., examined plaintiff (Tr. 551-52).  Dr. Sardar
observed that plaintiff walked with a cane and with a slow gait

5

and that plaintiff had difficulties standing and walking without
an assistive device (Tr. 551).  Dr. Sardar's examination of
plaintiff revealed a decreased range of lumbar spinal motion in
all planes, particularly with flexion and extension and with pain
reported at the end range, significant spasm, taut muscle bands,
tenderness to palpation over the lumbar paraspinal region bilat-
erally and "weakness to [the] right [leg] with 4/5" (Tr. 551).
The cervical spine had a normal range of motion and plaintiff's
arms were normal (Tr. 551).  Dr. Sardar diagnosed plaintiff with
myalgia,[2] muscle spasm, low back pain, right leg pain, gait
dysfunction, difficulty walking, opioid dependence and chronic
pain syndrome (Tr. 551).  Dr. Sardar prescribed Flexeril, Emla
cream, Percocet and physical therapy (Tr. 552).  Dr. Sardar also
administered an injection of Depo-Medrol and lidocaine to the
right sacroiliac joint (Tr. 552).

On August 1, 2012, Dr. Pierce noted that plaintiff
walked with a cane and that forward flexion was painful (Tr.
509).  He diagnosed plaintiff with chronic low back pain syn-
drome, opioid dependence, which was being treated by a methadone
maintenance treatment program, and a chronic hepatitis C infec-
tion (Tr. 509).  Dr. Pierce also renewed plaintiff's prescription

---

[2]Myalgia is pain in a muscle.  Dorland's Illustrated Medical
Dictionary ("Dorland's") 1214 (32nd ed. 2012).

for Percocet (Tr. 509).  Dr. Pierce saw plaintiff again on August
28, 2012 for chronic back pain (Tr. 504).  Dr. Pierce again noted
that forward flexion was painful (Tr. 504).  He also noted that
plaintiff's urine tested positive for oxycodone (Tr. 504).  Dr.
Pierce diagnosed plaintiff with a lumbar contusion and opioid
dependence, and he continued to prescribe Percocet to plaintiff
(Tr. 504).

 Plaintiff returned to Dr. Sardar on September 27, 2012
for chronic low back pain (Tr. 657-58).  Plaintiff's pain radi-
ated to his right leg, and the pain was accompanied by numbness
and tingling (Tr. 657).  Plaintiff also reported that his lower
back pain was an average of seven on a scale of one to ten (Tr.
657).  Plaintiff also stated that his medications were not
effective (Tr. 657).  An examination of the lumbar spine revealed
a decreased range of motion in all planes, particularly with
flexion and extension and with pain reported at the end range,
significant spasm, taut muscle bands, tenderness to palpation
over the lumbar paraspinal region bilaterally and "weakness to
[the] right [leg] with 4/5" (Tr. 657).  Dr. Sardar diagnosed
plaintiff with myalgia, low back pain, right leg pain, gait
dysfunction, difficulty walking, opioid dependence and chronic
pain syndrome (Tr. 657).  Dr. Sardar recommended plaintiff for
further physical therapy (Tr. 657).

Dr. Sardar examined plaintiff again on October 22, 2012 (Tr. 653-54).  Dr. Sardar noted that plaintiff's pain medications provided satisfactory relief, although plaintiff reported that his back pain on average was a seven on a scale of one to ten (Tr. 653).  On examination, the lumbar spine had a decreased range of motion in all planes, particularly with flexion and extension and with pain reported at the end range (Tr. 653).  Dr. Sardar also noted that plaintiff had significant spasm, taut muscle bands and tenderness to palpation over the lumbar paraspinal region bilaterally (Tr. 653).  Dr. Sardar diagnosed plaintiff with myalgia, muscle spasm, low back pain, pain in limb, gait dysfunction, difficulty walking, opioid dependence and chronic pain syndrome (Tr. 653).  Dr. Sardar recommended contin-ued physical therapy, and he ordered magnetic resonance imaging ("MRI") of plaintiff's lumbar spine (Tr. 653).

Dr. Pierce saw plaintiff on October 23, 2012 (Tr. 604). He noted that plaintiff had chronic low back pain, with pain now radiating to the left leg (Tr. 604).  Dr. Pierce also noted that plaintiff walked with a cane and had slightly decreased right leg strength and normal left leg strength (Tr. 604).  An examination revealed that plaintiff's lumbar range of motion was limited to sixty degrees in forward flexion and a straight-leg-raise test

was positive on the right side (Tr. 604).[3]   Dr. Pierce diagnosed

plaintiff with opioid dependence, which was being treated by a

methadone maintenance treatment program,, lumbar radiculopathy, a

chronic hepatitis C infection and lumbar contusion (Tr. 604).   An

October 31, 2012 MRI of the lumbar spine revealed significant

intervertebral disc narrowing and suggested degenerative disc

disease (Tr. 652).   There was no significant disc protrusion or

neural compromise at the T12 to S1 levels (Tr. 652).

Dr. Pierce saw plaintiff again on November 20, 2012

(Tr. 602).   That examination again revealed that a straight-leg-

raise test was positive on the right side (Tr. 602).   Dr. Pierce

noted that x-rays of the lumbar spine revealed sacralization[4]

(Tr. 602).   Dr. Pierce diagnosed plaintiff with opioid depend-

ence, which was being treated by a methadone maintenance treat-

ment program, and lumbar radiculitis[5] (Tr. 602).

---

[3]During this test, the patient lies on his or her back and lifts the symptomatic leg with the knee fully extended.  Dorland-'s at 1900.  Pain in the leg between 30 and 90 degrees of elevation indicates lumbar radiculopathy, "with the distribution of the pain indicating the nerve root involved."  Dorland's at 1900. Radiculopathy is a "disease of the nerve roots."  Dorland's at 1571.  It can be caused by inflammation or impingement by a tumor or bony spur.  Dorland's at 1571.

[4]Sacralization is an "anomalous fusion of the fifth lumbar vertebra to the first segment of the sacrum, so that the sacrum consists of six segments."  Dorland's at 1662.

[5]Radiculitis is "inflammation of the root of a spinal nerve,
(continued...)

Dr. Pierce examined plaintiff on February 19, 2013 (Tr. 699).  The examination conducted on that date again revealed that a straight-leg-raise test was positive on the right side (Tr. 699).  Dr. Pierce diagnosed plaintiff with lumbar radiculopathy and opioid and tobacco dependence (Tr. 699).

Plaintiff returned to Dr. Pierce on April 10, 2013 (Tr. 696).  Dr. Pierce again noted that plaintiff walked with a cane and his examination revealed that a straight-leg-raise test was positive on the right side (Tr. 696).  Plaintiff also told Dr. Pierce that he could not work because he was unable to lift heavy items and he experienced unrelenting low back pain when he stood for prolonged periods (Tr. 696).  Dr. Pierce diagnosed plaintiff with opioid dependence, which was being treated by a methadone maintenance treatment program, lumbar radiculopathy, lumbar contusion, tobacco abuse and a chronic hepatitis C infection (Tr. 696).

Dr. Pierce also completed a Multiple Impairment Questionnaire on April 10, 2013 (Tr. 901-08).  Dr. Pierce noted that he had treated plaintiff on a monthly basis since May 16, 2012 for lumbar contusion and lumbar radiculopathy (Tr. 901).  Dr.

───────────────

[5](...continued)
especially of that portion of the root which lies between the spinal cord and the intervertebral canal."  Dorland's at 1571.

Pierce noted that plaintiff's primary symptom was constant low
back pain that radiated to the right leg, precipitated by pro-
longed standing and walking (Tr. 902-03).

     Dr. Pierce opined that plaintiff could sit for three
hours total and stand/walk for two hours total in an eight-hour
workday (Tr. 903).  Dr. Pierce noted that plaintiff had to get up
and move around for five to ten minutes once an hour when sitting
(Tr. 903-04).  He opined that it would be necessary or medically
recommended that plaintiff not sit or stand/walk continuously in
a work setting (Tr. 903-04).  Additionally, Dr. Pierce believed
that plaintiff could lift/carry up to ten pounds occasionally and
that plaintiff had significant limitations in performing repeti-
tive reaching, handling, fingering or lifting (Tr. 904).  Dr.
Pierce cited the October 31, 2012 MRI of plaintiff's lumbar spine
in support of his diagnoses, as well as a positive right femoral
stretch sign (Tr. 901-02).[6]

     Dr. Pierce opined that plaintiff's symptoms would
likely increase if he were placed in a competitive work environ-
ment (Tr. 905).  He also noted that plaintiff's symptoms were
frequently severe enough to interfere with his attention and
concentration (Tr. 906).  Finally, Dr. Pierce noted that plain-

---

    [6]A femoral stretch test is used to diagnose lesions of the
third or fourth lumbar disc.  Dorland's at 1890.

tiff was capable of moderate stress and that plaintiff would likely be absent from work more than three times per month due to his impairments (Tr. 906-07).

b.   Dr. Catherine Pelczar-Wissner, M.D.

At the request of the SSA, Dr. Catherine Pelczar-Wissner performed a physical consultative examination of plaintiff on August 28, 2012 (Tr. 567-70).  Plaintiff complained of back pain (Tr. 567).  He also stated that he cleaned, did laundry, listened to the radio, shopped, showered and dressed "when he [got] a chance" (Tr. 568).

Dr. Pelczar-Wissner observed that plaintiff walked into the exam room with a very wide gait with a cane (Tr. 568).  Dr. Pelczar-Wissner indicated that plaintiff subsequently walked around with a slow, but normal, gait and that he was able to walk without the cane (Tr. 568).  Plaintiff was able to walk a few steps on his heels and toes, and then his gait became wide again once he started using the cane (Tr. 568).  In addition, plaintiff could squat only halfway (Tr. 568).  Plaintiff did not need help changing for the examination or getting on and off the table, and he was able to rise from a chair without difficulty (Tr. 568). Dr. Pelczar-Wissner did not believe plaintiff's cane was medically necessary (Tr. 568).

Dr. Pelczar-Wissner's examination of plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally and rotary movement bilaterally (Tr. 569). Additionally, straight-leg-raise testing was negative for both legs and the range of motion in plaintiff's lumbar spine was zero to sixty degrees (Tr. 569). Plaintiff's arms and legs all had a full range of motion, his joints were stable and nontender and his deep tendon reflexes were normal and equal in all extremities (Tr. 569). Plaintiff did not have any sensory deficits or muscle atrophy, and he had full strength in all extremities (Tr. 569). An x-ray of the lumbar spine was also negative (Tr. 569). Dr. Pelczar-Wissner diagnosed plaintiff with complaints of low back pain and a "history of substance abuse, on methadone since 2011 and off heroin since then" (Tr. 570). She also opined that plaintiff had a mild restriction for heavy lifting and carrying (Tr. 570).

2. <u>Mental Health Treatment Records</u>

a.   <u>Dr. Edward Fruitman, M.D.</u>[7]

Dr. Pierce referred plaintiff to a psychiatrist, Dr. Edward Fruitman, M.D., and plaintiff's treatment with Dr. Fruitman began on May 30, 2012 for bipolar disorder (Tr. 544).  During an appointment on June 12, 2012, plaintiff stated that he had mood swings and felt paranoid and nervous around people (Tr. 541-42).  Plaintiff also stated that he had had prior psychiatric treatment for bipolar disorder (Tr. 541).  Dr. Fruitman noted that plaintiff was shaking back and forth during the appointment, and he diagnosed plaintiff with "bipolar I disorder, most recent episode (or current) depressed, severe, without mention of psychotic behavior" (296.53) and "bipolar I disorder, most recent episode (or current) unspecified" (296.70) (Tr. 541).

Dr. Fruitman completed a Psychosocial Assessment on July 2, 2012 (Tr. 491).  According to this report, plaintiff was experiencing sadness, depression, severe insomnia, mood swings, auditory hallucinations, nervousness and paranoia around large crowds (Tr. 491).  Dr. Fruitman noted that plaintiff's legs were

---

[7]Dr. Fruitman's notes are handwritten and portions are illegible.  The legible portions of plaintiff's records are described herein.

shaking and that "he was extremely anxious" (Tr. 492).  Dr. Fruitman also reported that plaintiff was oriented to time, place and person, had good eye contact and was able to understand questions posed to him (Tr. 492).  Further, plaintiff was pleasant and did not demonstrate psychotic symptoms (Tr. 492).  Dr. Fruitman's examination also revealed a labile and broad affect and psychomotor agitation (Tr. 492).  Plaintiff denied any current hallucinations because they were controlled by medication (Tr. 492).  Plaintiff's memory did not appear to be impaired; additionally, plaintiff's judgment and impulse control were adequate, his speech, rate and tone were normal and his speech was fluent and goal-directed (Tr. 492-93).  Moreover, plaintiff was able to focus on tasks (Tr. 493).  Dr. Fruitman diagnosed plaintiff with bipolar disorder and a history of polysubstance abuse that was in remission (Tr. 493).  Dr. Fruitman rated plaintiff's Global Assessment of Functioning ("GAF") score as 68, indicating mild symptoms (Tr. 493).[8]  Dr. Fruitman noted that

---

[8]"The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008), quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000).  A score of 41-50 indicates serious symptoms, a score of 51-60 indicates moderate symptoms and a score of 61-70 indicates some mild symptoms or some difficulty in social or occupational functioning, but generally
(continued...)

plaintiff's mood changes had been evident in counseling sessions and that plaintiff needed to continue taking medication and attending psychotherapy (Tr. 493).

Plaintiff saw Dr. Fruitman for a follow-up appointment on July 24, 2012 (Tr. 511).  Plaintiff stated that he continued to have mood swings, but that he was "doing ok" (Tr. 511).  Dr. Fruitman noted that plaintiff was dressed appropriately and that he had been taking his medication (Tr. 511).

In a letter dated August 7, 2012, Dr. Fruitman reported that he was treating plaintiff for bipolar disorder (Tr. 495).  According to the letter, plaintiff felt he could not work because he was irritable and easily agitated and was anxious being around people (Tr. 495).  Additionally, plaintiff stated he had poor concentration and had frequent panic attacks (Tr. 495).  Dr. Fruitman reported that plaintiff was restless in their sessions and that plaintiff appeared to have frequent mood changes (Tr. 495).  Dr. Fruitman opined that plaintiff did not appear to be able to concentrate sufficiently to work (Tr. 495).

---

[8](...continued)
functioning "pretty well."  See Global Assessment of Functioning, New York State Office of Mental Health, available at https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_ functioning.pdf (last visited Feb. 28, 2017).

In a follow-up appointment on August 8, 2012, Dr. Fruitman reported that plaintiff was not exhibiting symptoms of psychosis or mania and was doing well on medication (Tr. 506-07). Dr. Fruitman diagnosed plaintiff with bipolar disorder, single manic episode, unspecified (Tr. 507).  On August 21, 2012, Dr. Fruitman noted that although plaintiff was taking his medication, plaintiff still felt nervous and overactive (Tr. 613).

Dr. Fruitman completed a report on September 18, 2012 at the request of the SSA (Tr. 572-78).  Dr. Fruitman reported that he had been treating plaintiff once a month since May 30, 2012 for bipolar disorder (Tr. 572).  He also reported that plaintiff's symptoms included mood swings, anger, anxiety, avoidance of large crowds and easy irritability (Tr. 572). According to the report, plaintiff did not like to work with people, and plaintiff stated that he got into arguments easily (Tr. 576).  Plaintiff's GAF score was 50, indicating serious symptoms; a mental status examination revealed stuttering speech, an anxious or hyper mood and nervousness (Tr. 574-75).  Dr. Fruitman opined that plaintiff could not deal with much stress and became "verbally explosive" due to poor coping skills (Tr. 576).  Dr. Fruitman also opined that plaintiff had a slightly impaired memory and that he lost concentration when given multiple tasks (Tr. 577).  Dr. Fruitman stated that plaintiff was

limited in his ability to interact socially because he did not
respond well to large crowds (Tr. 577).

On October 3, 2012, Dr. Fruitman noted that plaintiff
was feeling better and that his mood had improved with medication
(Tr. 607).  In a letter dated October 17, 2012, Dr. Fruitman
noted that plaintiff suffered from bipolar disorder (Tr. 606).
Dr. Fruitman also indicated that plaintiff's medications made
plaintiff drowsy and that plaintiff continued to attend monthly
appointments with both a psychiatrist and psychotherapist (Tr.
606).  According to the letter, plaintiff reported that he could
not work because of difficulty taking directions, easy agitation,
frequent anxiety attacks and an inability to be around people
(Tr. 606).

On October 24, 2012, plaintiff reported to Dr. Fruitman
that his mood and insomnia were improving (Tr. 603).  However, a
few weeks after that, on November 7, 2012, Dr. Fruitman noted
that plaintiff appeared sullen and depressed and was "not the
same as before" (Tr. 599).  On December 5, 2012, plaintiff
reported that he was feeling "ok" and that his insomnia and mood
improved with medication, with no side effects reported (Tr.
600).  However, on December 11, 2012, plaintiff informed Dr.
Fruitman that he had "problems (didn't want to share)" and that
he felt paranoid (Tr. 705).  Dr. Fruitman also noted plaintiff's

18

depressed mood (Tr. 705).  On January 4, 2013, plaintiff followed up with Dr. Fruitman for a medication refill (Tr. 704).  Plaintiff reported at that time that he was "doing ok," but that he was still experiencing depressive symptoms (Tr. 704).

Dr. Fruitman completed a Psychiatric/Psychological Impairment Questionnaire on January 8, 2013, covering the period from May 30, 2012 to January 4, 2013[9] (Tr. 683-90).  Dr. Fruitman diagnosed plaintiff with bipolar disorder (Tr. 683).  In addition, Dr. Fruitman noted that plaintiff's GAF score was 50, indicating serious symptoms, and his highest GAF score over the past seven months was 55, indicating moderate symptoms (Tr. 683). Dr. Fruitman reported that plaintiff responded to treatment, but was still suffering from mood swings (Tr. 683).  Dr. Fruitman found that plaintiff suffered from poor memory, sleep disturbance, recurrent panic attacks, social withdrawal or isolation, decreased energy, manic syndrome, generalized persistent anxiety and hostility or irritability (Tr. 684).  Plaintiff's primary symptoms were mood swings with hyperactivity at times and depression at other times (Tr. 685).

_____

[9]Dr. Fruitman wrote that plaintiff's most recent exam was January 4, 2012.  However, because Dr. Fruitman first treated plaintiff on May 30, 2012, Dr. Fruitman most likely meant that plaintiff's most recent exam was January 4, 2013.

Dr. Fruitman opined that plaintiff was markedly limited in his ability to:  (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (5) sustain ordinary routine without supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) complete a normal workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) interact appropriately with the general public; (9) accept instructions and respond appropriately to criticism from supervisors; (10) get along with co-workers or peers without distracting them or exhibiting behavioral extremes and (11) respond appropriately to changes in the work setting (Tr. 686-87).  Dr. Fruitman also opined that plaintiff had mild limitations in his ability to:  (1) remember locations and work-like procedures; (2) understand and remember one- or two-step instructions; (3) carry out simple one- or two-step instructions; (4) travel to unfamiliar places or use public transportation and (5) set realistic goals or make plans independently (Tr. 686-88).  Finally, Dr. Fruitman opined that there was no evidence of a limitation in plaintiff's ability to:  (1)

20

make simple work-related decisions; (2) ask simple questions or
request assistance; (3) maintain socially appropriate behavior
and to adhere to basic standards of neatness and cleanliness and
(4) be aware of normal hazards and take appropriate precautions
(Tr. 687-88).  Dr. Fruitman also opined that plaintiff was
incapable of tolerating "even 'low stress'" work (Tr. 689).
According to Dr. Fruitman, plaintiff would likely be absent from
work two to three times a month (Tr. 690).

Dr. Fruitman completed another Psychiatric / Psycholog-
ical Impairment Questionnaire on January 29, 2013, covering the
period from June 12, 2012 to January 4, 2013 (Tr. 674-81).  Dr.
Fruitman diagnosed plaintiff with bipolar disorder (Tr. 674).
Plaintiff's GAF score was 60, indicating moderate symptoms, and
his highest GAF score during that seven-month period was 68,
indicating mild symptoms (Tr. 674).  Dr. Fruitman reported that
plaintiff was responding to treatment (Tr. 674).  Dr. Fruitman
found that plaintiff suffered from frequent mood swings, poor
memory, mood disturbance, recurrent panic attacks, difficulty
thinking or concentrating, decreased energy, generalized persis-
tent anxiety and irritability (Tr. 674-75).  Plaintiff's primary
symptoms were mood swings, periods of irritability and insomnia
(Tr. 676).

Dr. Fruitman opined that plaintiff had marked limita-
tions in his ability to:  (1) understand and remember detailed
instructions; (2) carry out detailed instructions; (3) maintain
attention and concentration for extended periods; (4) sustain
ordinary routine without supervision; (5) work in coordination
with or proximity to others without being distracted by them; (6)
complete a normal workweek without interruptions from
psychologically-based symptoms and to perform at a consistent
pace without an unreasonable number and length of rest periods
and (7) accept instructions and respond appropriately to criti-
cism from supervisors (Tr. 677-78).  Dr. Fruitman also opined
that plaintiff had moderate limitations in his ability to:  (1)
perform activities within a schedule, maintain regular attendance
and be punctual within customary tolerance; (2) interact appro-
priately with the general public; (3) get along with co-workers
or peers without distracting them or exhibiting behavioral
extremes; (4) respond appropriately to changes in the work
setting and (5) set realistic goals or make plans independently
(Tr. 677-79).  Dr. Fruitman opined that plaintiff had mild
limitations in his ability to:  (1) remember locations and work-
like procedures; (2) understand and remember one- or two-step
instructions; (3) carry out simple one- or two-step instructions;
(4) make simple work-related decisions; (5) maintain socially

22

appropriate behavior and (6) travel to unfamiliar places or use
public transportation (Tr. 677-79).  Finally, Dr. Fruitman opined
that there was no evidence of a limitation in plaintiff's ability
to:  (1) ask simple questions or request assistance; (2) adhere
to basic standards of neatness and cleanliness and (3) be aware
of normal hazards and take appropriate precautions (Tr. 678-79).

Dr. Fruitman noted that plaintiff did not respond well
to criticism, that he could not remember detailed information and
that he had poor concentration (Tr. 677-78).  According to Dr.
Fruitman, plaintiff was incapable of "even 'low stress'" work and
would likely be absent from work two to three times a month (Tr.
680-81).

Plaintiff saw Dr. Fruitman on February 26, 2013 (Tr.
698).  At that time, plaintiff stated that he felt overwhelmed
and frustrated, and Dr. Fruitman observed that plaintiff was
anxious (Tr. 698).  Dr. Fruitman completed a Treating Physician's
Wellness Plan Report, in which Dr. Fruitman diagnosed plaintiff
with panic disorder and bipolar disorder (Tr. 692).  Dr. Fruitman
found that plaintiff knew who he was, where he was and the
approximate time and that he suffered from increased anxiety,
mood changes, periods of hyperactivity, passive suicide ideation
and feelings of depression and of being overwhelmed (Tr. 692).
He also found that plaintiff was compliant with treatment, which

23

included the medications Klonopin, Lamictal, Sinequan and Ambien
(Tr. 692).  Dr. Fruitman opined that plaintiff was unemployable
for six months (Tr. 693).

        b.   <u>Dr. Arlene Broska, Ph.D.</u>

        At the request of the SSA, Dr. Arlene Broska, Ph.D.,
performed a psychiatric consultative examination of plaintiff on
August 28, 2012 (Tr. 561-65).  Plaintiff complained of waking up
at night, having a poor appetite and feeling dysphoric and
fatigued (Tr. 561).  Plaintiff also complained that he got
anxious when around large numbers of people, that he got dis-
tracted and that he felt bad about himself (Tr. 561-62).  He
reported that he could dress, bathe and groom himself (Tr. 563).
He also stated that he cleaned and did the laundry every two
weeks (Tr. 563).  Plaintiff further stated that he shopped and
traveled independently on public transportation, although he did
not enjoy traveling independently (Tr. 563).  He also reported
that he had friends, listened to the radio and attended his drug
treatment program (Tr. 563).

        Dr. Broska observed that plaintiff's demeanor and
responsiveness to questions were cooperative and that his manner
of relating, social skills and overall presentation were fair
(Tr. 562).  According to Dr. Broska's report, plaintiff was

casually dressed and well groomed (Tr. 562).  Additionally, his posture and motor behavior were normal, and eye contact was appropriate (Tr. 562).  Plaintiff's thought process was coherent and goal-directed, his affect was anxious and his mood was neutral (Tr. 562-63).  There was no evidence of hallucinations, delusions or paranoia (Tr. 562).  Plaintiff's sensorium was clear and his attention was intact, and he knew who he was, where he was and the approximate time (Tr. 563).  Plaintiff's recent and remote memory skills were mildly impaired due to anxiety, and his insight and judgment were poor (Tr. 563).  Dr. Broska estimated that plaintiff's level of intellectual functioning was below average (Tr. 563).

Dr. Broska diagnosed plaintiff with bipolar disorder, not otherwise specified, opioid dependence and polysubstance dependence that was in early remission (Tr. 564).  She opined that plaintiff was able to follow and understand simple direc-tions and instructions, perform simple and complex tasks inde-pendently and maintain attention, concentration and a regular schedule (Tr. 563-64).  Dr. Broska also opined that plaintiff may not always make appropriate decisions, relate adequately with others or deal appropriately with stress (Tr. 564).  Dr. Broska concluded that "[t]he results of the examination appear to be consistent with psychiatric problems and substance abuse prob-

25

lems, but in itself, it does not appear to be significant enough
to interfere with the claimant's ability to function on a daily
basis" (Tr. 564).

c.  Dr. M. Meade

At the request of the SSA, Dr. M. Meade, a state agency
psychologist, reviewed the record and completed a Psychiatric
Review Technique form and a Mental Residual Functional Capacity
Assessment form on September 24, 2012 (Tr. 64-69).  Dr. Meade
opined that plaintiff was moderately limited in his ability to:
(1) understand and remember detailed instructions; (2) carry out
detailed instructions; (3) maintain attention and concentration
for extended periods; (4) complete a normal workday and workweek
without interruptions from psychologically-based symptoms and to
perform at a consistent pace without an unreasonable number and
length of rest periods; (5) interact appropriately with the
general public; (6) accept instructions and respond appropriately
to criticism from supervisors; (7) respond appropriately to
changes in the work setting and (8) travel in unfamiliar places
or use public transportation (Tr. 66-67).  Dr. Meade also opined
that plaintiff was not significantly limited in the following
abilities:  (1) remember locations and work-like procedures; (2)
understand and remember very short and simple instructions; (3)

26

carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to others without being distracted by them; (7) make simple work-related decisions; (8) ask simple questions or request assistance; (9) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; (10) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (12) be aware of normal hazards and take appropriate precautions and (13) set realistic goals or make plans independently of others (Tr. 66-67).

Dr. Meade noted that plaintiff's recent and remote memory skills were mildly impaired due to anxiety and that plaintiff lost concentration if given a large number of tasks (Tr. 66).  Dr. Meade also noted that plaintiff could not deal with significant stress and that, when confronted with stress, plaintiff would get "verbally explosive and [would lose] his coping skills" (Tr. 67).  Additionally, although plaintiff traveled independently by public transportation, he did not like to do so (Tr. 67).  Dr. Meade also noted that plaintiff got anxious and did not respond well to large crowds (Tr. 67).  Thus, Dr. Meade concluded that plaintiff was not disabled (Tr. 68).

27

                    d.   New York City
                         Correctional Health Services

        Plaintiff was incarcerated on April 17, 2013 for
approximately two months (Tr. 840).  During his time in incarcer-
ation, plaintiff received treatment for mood disorder,
polysubstance dependence and anti-social personality disorder
(Tr. 729-835).  Mental status examinations revealed irritable,
anxious and depressed moods (Tr. 745, 761, 779, 796), mildly
impaired judgment (Tr. 753, 780) and slight psychomotor agitation
(Tr. 796).  Plaintiff was prescribed Vistaril and Remeron, which
helped him to a limited extent (Tr. 761).  One doctor, Dr. Robert
Roy, noted that plaintiff was cooperative and that he had an
appropriate affect, adequate impulse control and judgment and
normal thought content (Tr. 745-46).  Dr. Roy rated plaintiff's
GAF score as 61 to 70, indicating mild symptoms (Tr. 746).

                    3.   Additional Evidence Submitted
                         to the Appeals Council

        Plaintiff submitted additional evidence to the Appeals
Council.  In an April 2014 Federation Employment & Guidance
Service report, the examining source indicated that plaintiff's
symptoms, including mood instability, a panic disorder and lumbar
radiculopathy, "would greatly inhibit his ability to work" (Tr.

                              28

931).  A social worker also noted that plaintiff "appeared to
have pain that caused him to alternate between sitting and
standing often" (Tr. 950).

Additionally, in May 2014, Dr. Fruitman completed
another Mental Impairment Questionnaire, in which he noted that
plaintiff's symptoms included hostility or irritability, manic
syndrome, difficulty thinking or concentrating, poor recent and
remote memory, generalized or persistent anxiety, recurrent panic
attacks, pervasive loss of interests, decreased energy, slowed
speech, visual hallucinations and insomnia (Tr. 984).  Dr.
Fruitman noted that plaintiff had moderate limitations in under-
standing and memory, concentration and persistence, social
interactions and adaptation, and he opined that plaintiff would
miss two to three days of work per month (Tr. 986-87).  In July
2014, Dr. Fruitman completed yet another Psychiatric / Psycholog-
ical Impairment Questionnaire and opined that plaintiff had
moderate limitations in understanding and memory, sustained
concentration and persistence, social interactions and adaptation
(Tr. 977-78).  He also opined that plaintiff was incapable of
handling "even 'low stress'" work and that he could be expected
to miss two to three days of work per month (Tr. 976, 979).[10]

---

[10]Plaintiff also submitted a report from Dr. Romeeda Moham-
(continued...)

D.  Proceeding
    Before the ALJ

An attorney represented plaintiff at the hearing before the ALJ (Tr. 32).  Plaintiff first testified about his physical limitations.  He explained that he had back pain since falling off a ladder in 2005 (Tr. 35).  Plaintiff's back pain was chronic, although it was worse on days when it was raining or cold or when plaintiff exerted himself (Tr. 39-40).  Plaintiff estimated that he could stand or sit for two to three hours, but he had to stop and rest after standing for about an hour and after sitting for forty-five minutes (Tr. 37, 41).  He also estimated that he could walk ten to fifteen blocks, but he had to take a break after six blocks (Tr. 37, 41-42).  Plaintiff also testified that he had been treated with pain injections and that he used a cane and wore a back brace (Tr. 35-36).  According to plaintiff, his medications caused significant drowsiness (Tr. 40).  After taking his medications, plaintiff had to lie down for two to three hours (Tr. 40).  Plaintiff described his pain as a seven or eight on a

---

[10](...continued)
med of All Med, but the Appeals Council declined to consider this evidence because the new information was dated October 14, 2014, post-dating the ALJ's December 6, 2013 decision (Tr. 2).

scale of one to ten without medication and a four with medication
(Tr. 42).

Plaintiff also testified about his mental limitations.
He stated he had anxiety and difficulty concentrating, remember-
ing and being around people he does not know (Tr. 36).  Plaintiff
described having anxiety or panic attacks when around a number of
people, in an elevator, or waiting on a long line; plaintiff
estimated that this occurred about three to four times per week
(Tr. 42).  He also had difficulty sleeping at night (Tr. 40-41).
Plaintiff also experienced paranoia and mood swings (Tr. 43).
Plaintiff saw a psychiatrist once a month and a therapist twice a
month and was taking medication (Tr. 36).

III.  <u>Analysis</u>

    A.  Applicable
       <u>Legal Principles</u>

       1.  <u>Standard of Review</u>

The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per
curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012);

Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover,
the court cannot "affirm an administrative action on grounds
different from those considered by the agency." Lesterhuis v.
Colvin, 805 F.3d 83, 87 (2d Cir. 2015), quoting Burgess v.
Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence.  Byam v. Barnhart, 336 F.3d 172, 179 (2d
Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir.
1999).  "Even if the Commissioner's decision is supported by
substantial evidence, legal error alone can be enough to overturn
the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322,
328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application
of the correct legal principles to the record could lead to only
one conclusion, there is no need to require agency reconsidera-
tion." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla.
It means such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion.'" Talavera v. Astrue,
supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S.
389, 401 (1971).  Consequently, "[e]ven where the administrative
record may also adequately support contrary findings on particu-

lar issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Selian v. Astrue, supra, 708 F.3d at 417 (internal quotation marks omitted).

        2.   Determination
             of Disability

        A claimant is entitled to SSI if the claimant can establish an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."[11] 42 U.S.C. § 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S.

---

        [11]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive disability insurance benefits under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Accordingly, cases addressing the latter are equally applicable to cases involving the former.

212, 217-22 (2002) (both the impairment and the inability to work must last twelve months).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 1382c(a)(3)(D), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. § 1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 416.920(a)(4); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at

34

151.   The first step is a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. § 416.920(a)(4)(ii).  If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. § 416.920(a)(4)(iii).  To be found disabled based on a listing, the claimant's medically determinable impairment must satisfy all of the criteria of the relevant listing.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Otts v. Commissioner of Soc. Sec., 249 F. App'x 887, 888 (2d Cir. 2007) (summary order); 20 C.F.R. § 416.920(a)(4)(iii).  If the claimant meets a listing, the claimant is disabled.  20 C.F.R. § 416.920(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC.  20 C.F.R. § 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25.  If he cannot, then the fifth step requires assessment of whether, given the claimant's RFC, he can make an adjustment to

other work.  20 C.F.R. § 416.920(a)(4)(v).  If he cannot, he will be found disabled.  20 C.F.R. § 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).  To determine RFC, the ALJ "'identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945.'" Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of this assessment determine the claimant's ability to perform the exertional demands[12] of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.  20 C.F.R. § 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found to be limited further by nonexertional factors that restrict the claimant's ability to work.[13]  See

---

[12]Exertional limitations are those which "affect [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. § 416.969a(b).

[13]Nonexertional limitations are those which "affect only [the claimant's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because
(continued...)

<u>Michaels v. Colvin</u>, 621 F. App'x 35, 38 n.4 (2d Cir. 2015)
(summary order); <u>Zabala v. Astrue</u>, 595 F.3d 402, 410 (2d Cir.
2010).

     The claimant bears the initial burden of proving
disability with respect to the first four steps.  Once the
claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than his past
work.  <u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 418; <u>Burgess v.
Astrue</u>, <u>supra</u>, 537 F.3d at 128; <u>Butts v. Barnhart</u>, 388 F.3d 377,
383 (2d Cir. 2004), <u>amended in part on other grounds on reh'g</u>,
416 F.3d 101 (2d Cir. 2005).

     In some cases, the Commissioner can rely exclusively on
the medical-vocational guidelines (the "Grids") contained in
C.F.R. Part 404, Subpart P, Appendix 2 when making the determina-
tion at the fifth step.  <u>Gray v. Chater</u>, 903 F. Supp. 293, 297-98
(N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's
RFC in conjunction with the claimant's age, education and work
experience.  Based on these factors, the Grid[s] indicate[]

---

    [13](...continued)
of nervousness, anxiety or depression, maintaining attention or
concentration, understanding or remembering detailed instruc-
tions, seeing or hearing, tolerating dust or fumes, or manipula-
tive or postural functions, such as reaching, handling, stooping,
climbing, crawling or crouching.  20 C.F.R. § 416.969a(c).

37

whether the claimant can engage in any other substantial gainful work which exists in the national economy."  Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work."  Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383-84.  "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  Bapp v. Bowen, supra, 802 F.2d at 606 (footnote omitted); accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411.  When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform."  Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks and citation omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particu-

38

lar limitations must be considered."). An ALJ may rely on a vocational expert's testimony presented in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert base[s] his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983) (footnote omitted); accord Snyder v. Colvin, 15-3502, 2016 WL 3570107 at *2 (2d Cir. June 30, 2016) (summary order) ("When the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony."); Rivera v. Colvin, 11 Civ. 7469 (LTS)(DF), 2014 WL 3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

3. Treating Physician Rule

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling

39

weight if it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in . . . [the] record."  20 C.F.R.
§ 416.927(c)(2)[14]; see also Shaw v. Chater, 221 F.3d 126, 134 (2d
Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995);
Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

        "[G]ood reasons" must be given for declining to afford
a treating physician's opinion controlling weight.  20 C.F.R. §
416.927(c)(2); see Schisler v. Sullivan, supra, 3 F.3d at 568;
Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3
(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has
noted that it "'do[es] not hesitate to remand when the Commis-
sioner has not provided "good reasons" for the weight given to a
treating physician['] opinion.'"  Morgan v. Colvin, 592 F. App'x
49, 50 (2d Cir. 2015) (summary order) (second alteration in
original), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir.
2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015)
(per curiam).  Before an ALJ can give a treating physician's
opinion less than controlling weight, the ALJ must consider

--------

[14]SSA recently adopted regulations that alter the standards
applicable to the review of medical opinion evidence for claims
filed on or after March 27, 2017.  See 20 C.F.R. § 416.920c.
Because plaintiff's claim was filed before that date, those
amended regulations do not apply here.

various factors to determine the amount of weight the opinion
should be given.  These factors include:  (1) the length of the
treatment relationship and the frequency of examination; (2) the
nature and extent of the treatment relationship; (3) the medical
support for the treating physician's opinion; (4) the consistency
of the opinion with the record as a whole; (5) the physician's
level of specialization in the area, and (6) other factors that
tend to support or contradict the opinion.  20 C.F.R. §
416.927(c)(2)-(6); see Schisler v. Sullivan, supra, 3 F.3d at
567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at
*16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); Matovic v. Chater,
94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996)
(McKenna, D.J.).  Although the foregoing factors guide an ALJ's
assessment of a treating physician's opinion, the ALJ need not
expressly address each factor.  Atwater v. Astrue, 512 F. App'x
67, 70 (2d Cir. 2013) (summary order) ("We require no such
slavish recitation of each and every factor where the ALJ's
reasoning and adherence to the regulation are clear.").

          As long as the ALJ provides "good reasons" for the
weight accorded to the treating physician's opinion and the ALJ's
reasoning is supported by substantial evidence, remand is unwar-
ranted.  See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see
also Atwater v. Astrue, supra, 512 F. App'x at 70; Petrie v.

41

Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order);
Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary
order).  "The opinions of examining physicians are not control-
ling if they are contradicted by substantial evidence, be that
conflicting medical evidence or other evidence in the record."
Krull v. Colvin, 15-4016, 2016 WL 5417289 at *1 (2d Cir. Sept.
27, 2016) (summary order) (citation omitted).  The ALJ is respon-
sible for determining whether a claimant is "disabled" under the
Act and need not credit a physician's determination to this
effect where it is contradicted by the medical record.  See Wells
v. Commissioner of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009)
(summary order).  The ALJ may rely on a consultative opinion
where it is supported by substantial evidence in the record.  See
Richardson v. Perales, supra, 402 U.S. at 408; Camille v. Colvin,
652 F. App'x 25, 27-28 (2d Cir. 2016) (summary order); Diaz v.
Shalala, supra, 59 F.3d at 313 n.5; Mongeur v. Heckler, supra,
722 F.2d at 1039.

       4.  Credibility

       In determining a claimant's RFC, the ALJ is required to
consider the claimant's reports of pain and other limitations, 20
C.F.R. § 416.929, but is not required to accept the claimant's
subjective complaints without question.  McLaughlin v. Secretary

of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980).
"It is the function of the [Commissioner], not [the reviewing
courts], to resolve evidentiary conflicts and to appraise the
credibility of witnesses, including the claimant." Carroll v.
Secretary of Health & Human Servs., 705 F.2d 638, 642 (2d Cir.
1983) (internal quotation marks omitted); see also Mimms v.
Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984); Aponte v. Secre-
tary, Dep't of Health & Human Servs., 728 F.2d 588, 591-92 (2d
Cir. 1984).  The ALJ has discretion to weigh the credibility of
the claimant's testimony in light of the medical findings and
other evidence in the record.  Marcus v. Califano, 615 F.2d 23,
27 (2d Cir. 1979).

The regulations provide a two-step process for evaluat-
ing a claimant's subjective assertions of disability.

> At the first step, the ALJ must decide whether the
> claimant suffers from a medically determinable impair-
> ment that could reasonably be expected to produce the
> symptoms alleged.  20 C.F.R. § 404.1529(b).  That
> requirement stems from the fact that subjective asser-
> tions of pain alone cannot ground a finding of disabil-
> ity.  20 C.F.R. § 404.1529(a).  If the claimant does
> suffer from such an impairment, at the second step, the
> ALJ must consider "the extent to which [the claimant's]
> symptoms can reasonably be accepted as consistent with
> the objective medical evidence and other evidence" of
> record.  Id.  The ALJ must consider "[s]tatements [the
> claimant] or others make about [his] impairment(s),
> [his] restrictions, [his] daily activities, [his]
> efforts to work, or any other relevant statements [he]
> make[s] to medical sources during the course of exami-
> nation or treatment, or to [the agency] during inter-

views, on applications, in letters, and in testimony in
[its] administrative proceedings."  20 C.F.R. §
404.1512(b)(3); see also 20 C.F.R. § 404.1529(a);
S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49 (alterations and emphasis
in original); see also Snyder v. Colvin, supra, 2016 WL 3570107
at *1-*2, citing SSR 16-3P, 2016 WL 1119029 (Mar. 16, 2016)[15]; 20
C.F.R. § 416.929(a).  The ALJ must explain the decision to reject
a claimant's testimony "'with sufficient specificity to enable
the [reviewing] Court to decide whether there are legitimate
reasons for the ALJ's disbelief' and whether [the ALJ's] decision
is supported by substantial evidence."  Calzada v. Astrue, 753 F.
Supp. 2d 250, 280 (S.D.N.Y. 2010) (Sullivan, D.J.) (alteration in
original) (adopting report and recommendation), quoting Fox v.
Astrue, No. 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at *12
(N.D.N.Y. Mar. 26, 2008); see also Lugo v. Apfel, 20 F. Supp. 2d
662, 664 (S.D.N.Y. 1998) (Rakoff, D.J.).  The ALJ's determination
of credibility is entitled to deference.  See Snell v. Apfel, 177
F.3d 128, 135 (2d Cir. 1999) ("After all, the ALJ is in a better
position to decide issues of credibility."); Gernavage v. Shalal-
a, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) (Leisure, D.J.)

---

[15]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2,
1996), and clarifies the policies set forth in the previous SSR.
See SSR 16-3P, supra, 2016 WL 1237954.

("Deference should be accorded the ALJ's determination because he heard plaintiff's testimony and observed his demeanor.").

B.  <u>The ALJ's Decision</u>

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 15-26).

At step one of the sequential analysis, the ALJ determined that plaintiff had not engaged in substantial gainful activity since June 12, 2012, the date plaintiff filed an application for SSI (Tr. 20, <u>citing</u> 20 C.F.R. § 416.971 <u>et</u> <u>seq</u>.).

At step two, the ALJ found that plaintiff had the following severe medically determinable impairments:  degenerative disc disease of thoracic spine; history of lumbar contusion; impulse control disorder; bipolar affective disorder, depressed; anxiety disorder; antisocial personality disorder and "[h]istory of [p]olysubstance (heroin, alcohol, marijuana, crack cocaine, benzodiazepine, PCP, and street methadone) [d]ependence on [m]ethadone [m]aintenance" (Tr. 20, <u>citing</u> 20 C.F.R. §§ 416.908, 416.920(c)).  The ALJ found that plaintiff's history of chronic hepatitis C infection was not severe because it did not cause hepatic complications (Tr. 20).  The ALJ also found that plaintiff's history of schizophrenia was not severe because it was "so remote as to not now be relevant" (Tr. 20).

45

At step three, the ALJ found that plaintiff's disabili-
ties did not meet the criteria of the listed impairments and that
plaintiff was not, therefore, entitled to a presumption of
disability (Tr. 20-22).  The ALJ observed that there was no
evidence to support the criteria of any listing and no "opinion
by a physician or psychologist designated by the Commissioner
that the claimant has an impairment" that meets or equals any of
the listings (Tr. 20-21).  Specifically, the ALJ analyzed whether
plaintiff's physical impairments met listing 1.00 (musculoskelet-
al impairments) and whether plaintiff's mental impairments met
listings 12.04 (affective disorders), 12.06 (anxiety-related
disorders), 12.08 (personality disorders) and 12.09 (substance
addition disorders).  20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ then determined that plaintiff retained the
physical RFC to

> occasionally lift and/or carry a maximum of 20 pounds;
> to frequently lift and/or carry up to 10 pounds; to
> cumulatively (and not necessarily continuously) sit,
> stand and/or walk with normal breaks up to a total of 6
> hours in an 8-hour workday; and to push and/or pull up
> to his lifting/carrying limitations.

(Tr. 22-23 (footnotes omitted)).

The ALJ also determined that plaintiff retained the
mental RFC to

> perform the simple, routine, repetitive type tasks
> involved in unskilled work . . . including the abili-

46

ties to understand, remember, and carry out simple
instructions; to make simple work-related decisions; to
respond appropriately to supervision, co-workers and
usual work situations; and to deal with changes in a
routine work setting except for work requiring the
stressor of more than occasional contact with others.

(Tr. 23).

To reach his RFC determination, the ALJ examined the
opinions of the treating and consulting physicians and assessed
the weight to give to each opinion based on the objective medical
record.

With respect to plaintiff's physical impairments, the
ALJ afforded "little (and not controlling) weight" to Dr. Pierce-
's assessment of plaintiff's exertional limitations because the
ALJ found that it was contradicted by Dr. Pierce's own records
(Tr. 23-24).  The ALJ noted that while Dr. Pierce cited a lumbar
spine MRI to support his conclusion regarding plaintiff's re-
strictions in his Multiple Impairment Questionnaire, the only MRI
of record of plaintiff's lumbar spine, taken on October 31, 2012,
did not show lumbosacral abnormalities, although it did show disc
narrowing at T10-T11 (Tr. 23).  The ALJ also noted that Dr.
Pierce's exam on May 7, 2012 reported normal findings, and during
that examination plaintiff had complained "only of moderate pain"
(Tr. 23).  Moreover, the ALJ stated that while plaintiff reported

worsening symptoms to Dr. Pierce over time, "no basis was shown
for this development" (Tr. 23).

The ALJ also found that Dr. Pierce's findings were
contradicted by Dr. Pelczar-Wissner's findings (Tr. 23-24).
Specifically, Dr. Pelczar-Wissner found that plaintiff's use of a
cane was not medically necessary and that there was "only a mild
restriction for heavy lifting and carrying" (Tr. 23-24 (internal
quotation marks omitted)).  The ALJ further noted that Dr.
Pelczar-Wissner's assessment was consistent with Dr. Fruitman's
finding that plaintiff's only physical limitation was an inabil-
ity to perform heavy lifting and with a hospital treatment record
dated July 5, 2011 noting that plaintiff did not have any ambula-
tory or gait problems (Tr. 24).  Thus, the ALJ gave "partial
weight" to Dr. Pelczar-Wissner's opinion because "it was made by
an acceptable medical source who has a great degree of under-
standing of Social Security disability programs and their eviden-
tiary requirements and because it is consistent with the medical
findings of record" (Tr. 24).

With respect to plaintiff's mental impairments, the ALJ
afforded "little (and not controlling) weight" to Dr. Fruitman's
assessment (Tr. 24).  The ALJ noted that Dr. Fruitman's assess-
ment that plaintiff had specific marked restrictions in the
January 29, 2013 Psychiatric/Psychological Impairment Question-

48

naire was contradicted by a GAF score of 60 in that same ques-
tionnaire (Tr. 24).  The ALJ also found that the questionnaire
covered the period from June 6, 2012 through January 4, 2013, a
time period during which Dr. Broska assessed functional limita-
tions that were "radically less restrictive" (Tr. 24).

        The ALJ afforded "great weight" to Dr. Broska and Dr.
Meade's opinions because they were made "after a comprehensive
evaluation of either [plaintiff] or of the documentary evidence
of record regarding [plaintiff's] mental impairments," because
they were supported by the medical evidence in the record and
because "they [were] made by acceptable medical sources who have
a great degree of understanding of Social Security disability
programs and their evidentiary requirements" (Tr. 24).

        Next, the ALJ found that plaintiff was not credible.
He found that although plaintiff's medically determinable impair-
ments could reasonably be expected to cause plaintiff's claimed
symptoms to some degree, plaintiff's statements concerning the
intensity, persistence and limiting effects of his symptoms were
not consistent with the "objective medical and other evidence
especially in light of [plaintiff's] description of his essen-
tially unlimited activities of daily living and his spares [sic]
work history" (Tr. 25).

At step four, the ALJ found that plaintiff was unable to perform any past relevant work as a barber's apprentice because he would have needed to be in constant contact with other people (Tr. 25).

At step five, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given his age, education, work experience and RFC and the rules in the Grids (Tr. 25).  The ALJ noted that if plaintiff had the RFC to perform the full range of light work, "a finding of not disabled would have been directed by Grid Rule 202.18" (Tr. 25 (internal quotation marks omitted)).  However, plaintiff's "additional limitations have little or no effect on the occupational base of unskilled light work" (Tr. 25-26).  Citing SSR 85-15, the ALJ stated that "a limitation to unskilled work which ordinarily involves dealing with objects rather than with data or people would not significantly erode the occupational bases for work at all exertional levels" (Tr. 26).  Accordingly, the ALJ found that plaintiff was not disabled (Tr. 26).

C.  Analysis of the
    ALJ's Decision

Plaintiff contends that the ALJ committed legal error and that his decision was not supported by substantial evidence

50

(Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated Oct. 30, 2015 (D.I. 12) ("Pl.'s Mem.")).

As described above, the ALJ went through the sequential process required by the regulations.  The ALJ's analysis at steps one and two were decided in plaintiff's favor, and the Commissioner has not challenged those findings.  The ALJ's analysis at step three was decided in the Commissioner's favor, and plaintiff has not challenged that finding.  I shall, therefore, limit my discussion to whether the ALJ's analysis at steps four and five complied with the applicable legal standards and was supported by substantial evidence.

1.  ALJ's Analysis at
    Step Four: RFC Assessment

Plaintiff objects to the ALJ's RFC assessment on two grounds.  First, plaintiff asserts that the ALJ failed to weigh properly the medical opinion evidence (Pl.'s Mem., at 11-19).  Second, plaintiff argues that the ALJ failed to evaluate properly plaintiff's credibility (Pl.'s Mem., at 19-21).  For the reasons stated below, I conclude that the ALJ's analysis in both regards was flawed.

a.  Medical Opinion Evidence

Plaintiff argues that the ALJ erred in failing to give Dr. Pierce and Dr. Fruitman's opinions controlling weight because they were supported by medically acceptable clinical and labora-tory diagnostic techniques and were consistent with substantial evidence in the record (Pl.'s Mem., at 11-19).

i.  Dr. Pierce

With respect to plaintiff's physical RFC, the ALJ "afforded little (and not controlling weight) to Dr. Pierce's assessment of [plaintiff's] exertional limitations" because the assessment was not supported by the MRI that Dr. Pierce cited and because it was contradicted by Dr. Pierce's other findings and by Dr. Pelczar-Wissner's findings (Tr. 23-24).  The ALJ gave "par-tial weight" to Dr. Pelczar-Wissner's opinion because, in part, they were consistent with Dr. Fruitman's opinion that plaintiff's only physical limitation was an inability to perform heavy lifting and with a hospital treatment record that did not note any ambulatory or gait problems (Tr. 23-24).

The ALJ's decision is problematic for several reasons. First, contrary to the ALJ's finding, Dr. Pierce's assessment of plaintiff's exertional limitations is supported by medically

52

acceptable clinical and laboratory diagnostic techniques.  While
the MRI did not show lumbosacral abnormalities, it did show
significant intervertebral disc narrowing and suggested degenera-
tive disc disease (Tr. 652).  The ALJ did not explain how those
MRI results were inconsistent with Dr. Pierce's assessment of
plaintiff's exertional limitations.  Additionally, the ALJ did
not acknowledge an x-ray taken a month after the MRI that showed
sacralization.  Dr. Pierce also cited a positive right femoral
stretch sign in support of his opinions concerning plaintiff's
exertional limitations; the ALJ also failed to acknowledge this
fact.

        Second, the ALJ's conclusion that Dr. Pierce's assess-
ment was not supported by substantial evidence is based on an
improper selective view of the record.  Clarke v. Colvin, 15 Civ.
354, 2017 WL 414489 at *9 (S.D.N.Y. Jan. 31, 2017) (Forrest,
D.J.) ("[T]he ALJ selectively relied on evidence that weighed
against a finding of disability.  This is improper -- an ALJ may
not 'pick and choose evidence which favors a finding that the
claimant is not disabled.'"), quoting Rodriquez v. Astrue, 07
Civ. 534 (WHP)(MHD), 2009 WL 637154 at *25 (S.D.N.Y. Mar. 9,
2009) (Pauley, D.J.).  Although the ALJ was correct that a
physical examination on May 7, 2012 was normal, the ALJ ignored
other evidence that would support Dr. Pierce's assessment of

plaintiff's exertional limitations.  Dr. Pierce's findings during
his multiple examinations of plaintiff included pain with forward
flexion (Tr. 504, 509, 546), a limited range of lumbar spinal
motion to sixty degrees in forward flexion (Tr. 604) and positive
straight-leg-raise testing for the right side (Tr. 601, 604, 696,
699).  Dr. Pierce also either renewed or increased plaintiff's
prescription for Percocet on multiple occasions (Tr. 504, 509,
543).  Dr. Sardar also found significant spasm, taut muscle
bands, tenderness to palpation over the lumbar paraspinal region
bilaterally and a "weakness to [the] right [leg] with 4/5"; Dr.
Sardar also recommended that plaintiff take medications and
attend physical therapy (Tr. 551-52, 657).[16]  Additionally,
although the ALJ noted that there was no basis in the record for

---

[16]The Commissioner argues that "[s]ignificantly, Dr. Sardar
did not preclude Plaintiff from the performance of work-related
activities" (Memorandum of Law in Support of the Commissioner's
Cross-Motion for Judgment on the Pleadings and in Opposition to
Plaintiff's Motion for Judgment on the Pleadings, filed Nov. 24,
2015 (D.I. 15) ("Def.'s Mem."), at 16).  Dr. Sardar's silence
does not weigh for or against a finding of disability.  Compare
Rosa v. Callahan, 168 F.3d 72, 81 (2d Cir. 1999) ("[T]here was no
indication in the reports that the consultants intended anything
by their silence or that they set out to 'express [an] opinion on
[the] subject . . . ." (second and third alterations in original;
internal quotation marks omitted)), with Dumas v. Schweiker,
supra, 712 F.2d at 1553 ("The [Commissioner] is entitled to rely
not only on what the record says, but also on what it does not
say."), citing Rutherford v. Schweiker, 685 F.2d 60, 63 (2d Cir.
1982) and Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982)
(per curiam).

plaintiff's claim of worsening symptoms during subsequent visits, a "patient's reports of complaints, or history, is an essential diagnostic tool." <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 107 (2d Cir. 2003) (internal quotation marks omitted).

Third, the ALJ's conclusion that Dr. Pierce's assessment should be discounted because it was inconsistent with Dr. Pelczar-Wissner's assessment is problematic. Dr. Pelczar-Wissner examined plaintiff on one occasion and did not have the benefit of plaintiff's complete medical record. "Opinions from a one-time consultative physician are not ordinarily entitled to significant weight, in particular where that physician does not have the benefit of the complete medical record." <u>Duran v. Colvin</u>, 14 Civ. 8677 (HBP), 2016 WL 5369481 at *18 (S.D.N.Y. Sept. 26, 2016) (Pitman, M.J.); <u>see</u> <u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 419 ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination."); <u>Tarsia v. Astrue</u>, 418 F. App'x 16, 18 (2d Cir. 2011) (summary order) ("Because it is unclear whether [the consulting physician] reviewed all of [the claimant's] relevant medical information, his opinion is not 'supported by evidence of record' as required to override the opinion of [the] treating physician."). Moreover, the fact that Dr. Pelczar-Wissner's assessment was consistent with Dr. Fruitman's assessment and the

55

hospital ambulatory note is not persuasive because Dr. Fruitman
was treating plaintiff for his mental impairments, not his
physical impairments, and the hospital ambulatory note related to
a single examination conducted more than a year before Dr.
Pelczar-Wissner performed her consultative examination.

The ALJ's decision to discount Dr. Pierce's opinion was
directly relevant to the ALJ's RFC determination.  Dr. Pierce
opined that plaintiff could sit for three hours total and
stand/walk for two hours total in an eight-hour workday and that
plaintiff could lift/carry ten pounds occasionally (Tr. 903-04).
That is inconsistent with the ALJ's physical RFC finding.

### ii.  Dr. Fruitman

With respect to plaintiff's mental RFC, the ALJ "af-
forded little (and not controlling) weight to Dr. Fruitman's
assessment of [plaintiff's] mental limitations" because it was
contradicted by Dr. Broska's assessment that plaintiff had
"functional limitations that are radically less restrictive," and
by Dr. Fruitman's own determination that plaintiff had a GAF
score of 60 (Tr. 24).  The ALJ "afforded great weight" to the
assessments of Drs. Broska and Meade "because those opinions were
made after a comprehensive evaluation of either the claimant or
of the documentary evidence of record regarding [plaintiff's]

56

mental impairments" and because they were supported by the
medical evidence, among other reasons (Tr. 24).

This aspect of the ALJ's decision is problematic for
several reasons.  First, "[a] medical opinion may be assigned
more weight if it is supported by psychiatric signs, which are
medically demonstrable phenomena that indicate specific psycho-
logical abnormalities, e.g. abnormalities of behavior, mood,
thought, memory, orientation, development, or perception."
Burgess v. Colvin, 15 Civ. 9585 (RLE), 2016 WL 7339925 at *12
(S.D.N.Y. Dec. 19, 2016) (Ellis, M.J.), citing 20 C.F.R. §
416.928; see Sanfilippo v. Colvin, No. 14-CV-3067 (RRM), 2016 WL
1252757 at *8 (E.D.N.Y. Mar. 27, 2016) (ALJ erred by failing to
give treating psychiatrist's opinion controlling weight because
her reports were "clearly based on clinical findings of psychiat-
ric abnormalities"), judgment entered by, 2016 WL 1226752
(E.D.N.Y. Mar. 27, 2016).  Dr. Fruitman's assessment was sup-
ported by psychiatric signs; specifically, he found that plain-
tiff suffered from poor memory, mood disturbance, recurrent panic
attacks, difficulty thinking or concentrating, decreased energy,
generalized persistent anxiety and irritability (Tr. 675).

Second, Dr. Fruitman's treatment notes support his
assessment of plaintiff's mental limitations.  For example, Dr.
Fruitman found that even though plaintiff was responding to

57

treatment, he was still experiencing mood swings, auditory hallucinations, nervousness, anger, depression, easy irritability and anxiety (Tr. 495, 549, 572, 575, 599, 674, 683, 692, 698). Dr. Fruitman had also opined that plaintiff could not deal with stress and became "verbally explosive" due to poor coping skills (Tr. 576). Additionally, according to Dr. Fruitman, plaintiff had a slightly impaired memory and a loss of concentration when given a lot of tasks (Tr. 577). These treatment notes are consistent with plaintiff's health records made during his brief incarceration (Tr. 745, 753, 761, 779, 780, 796).[17]

---

[17]The ALJ's conclusion that Dr. Fruitman's assessment should not be given controlling weight because it was inconsistent with plaintiff's GAF score of 60 does not, by itself, require remand. A GAF score is of limited value; as explained in Mainella v. Colvin, No. 13-CV-2453-JG, 2014 WL 183957 at *5 (E.D.N.Y. Jan. 14, 2014), the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (the "DSM") has dropped the use of GAF scores, and SSA has limited their use because there is "no way to standardize measurement and evaluation." (internal quotation marks omitted). Additionally, the GAF score is not designed to predict outcomes and is so "general that [it is] not useful without additional supporting description and detail." Mainella v. Colvin, supra, 2014 WL 183957 at *5; see Berry v. Commissioner of Soc. Sec., 14 Civ. 3977 (KPF), 2015 WL 4557374 at *3 n.10 (S.D.N.Y. July 29, 2015) (Failla, D.J.).

Nonetheless, plaintiff's GAF score was not the only factor the ALJ considered in declining to give Dr. Fruitman's opinion controlling weight. See Gonzalez v. Colvin, No. 15-CV-6123P, 2016 WL 4009532 at *5-*6 (W.D.N.Y. July 27, 2016); Camille v. Colvin, 104 F. Supp. 3d 329, 342 (W.D.N.Y. 2015), aff'd, 652 F. App'x 25 (2d Cir. 2016) (summary order). Moreover, "the ALJ was permitted to consider Plaintiff's GAF score[] as part of [his]
(continued...)

Third, the ALJ should not have afforded Dr. Broska's and Dr. Meade's opinions great weight. "Where mental health treatment is at issue, the treating physician rule takes on added importance" because "the longitudinal relationship between a mental health patient and [his] treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative exam." Bodden v. Colvin, 14 Civ. 8731 (SN), 2015 WL 8757129 at *9 (S.D.N.Y. Dec. 14, 2015) (Netburn, M.J.). Dr. Broska examined plaintiff one time and did not have the benefit of plaintiff's complete medical record. See Selian v. Astrue, supra, 708 F.3d at 419; Tarsia v. Astrue, supra, 418 F. App'x at 18; Duran v. Colvin, supra, 2016 WL 5369481 at *18. Moreover, although Dr. Meade had access to plaintiff's medical records, Dr. Meade did not examine plaintiff. Affording controlling weight to a physician who merely conducts a record review is particularly problematic when dealing with mental impairments because "observation of the patient is critical to understanding the subjective nature of

---

[17](...continued)
analysis because Volume IV [of the DSM, which included GAF scores] was in effect at the time of Plaintiff's treatment." Camille v. Colvin, supra, 104 F. Supp. 3d at 342; see Vanterpool v. Colvin, 12 Civ. 8789 (VEC)(SN), 2014 WL 1979925 at *2 n.2 (S.D.N.Y. May 15, 2014) (Caproni, D.J.) (adopting report and recommendation).

the patient's disease and in making a reasoned diagnosis."
Rodriguez v. Astrue, supra, 2009 WL 637154 at *26 (internal
quotation marks omitted); see Vazquez v. Commissioner of Soc.
Sec., 14 Civ. 6900 (JCF), 2015 WL 4562978 at *14 (S.D.N.Y. July
21, 2015) (Francis, M.J.).   Thus, "[c]ourts have held that the
conclusions of a physician who merely reviews a medical file and
performs no examination are entitled to little, if any, weight."
Rodriguez v. Astrue, supra, 2009 WL 637154 at *26 (internal
quotation marks omitted).

          The ALJ's decision to discount Dr. Fruitman's opinion
was directly relevant to the ALJ's RFC determination.   Dr.
Fruitman opined that plaintiff had marked limitations in his
ability to sustain an ordinary routine without supervision, to
work in coordination with or proximity to others without being
distracted by them and to accept instructions and respond appro-
priately to criticism from supervisors (Tr. 677-78).   Dr. Fruit-
man also opined that plaintiff had moderate limitations in his
ability to respond appropriately to changes in the work setting
(Tr. 678).   These opinions are inconsistent with the ALJ's mental
RFC finding.[18]

_____

          [18]Dr. Fruitman's opinion that plaintiff had mild limitations
in the ability to understand, remember and carry out simple one-
or two-step instructions and to make simple work-related deci-
                                        (continued...)

Thus, the ALJ's RFC determination, which discounted plaintiff's treating physicians' opinions, was not supported by substantial evidence and warrants remand.[19]

### b.   Credibility Assessment

The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms could not reasonably be accepted as consistent "with the objective medical and other evidence especially in light of [plaintiff's] description of his essentially unlimited activities of daily living and his spares [sic] work history" (Tr. 25). Plaintiff argues that the ALJ's credibility assessment is not supported by substantial evidence.  First, plaintiff argues that

---

[18](...continued)
sions, and Dr. Fruitman's opinion that plaintiff had limitations in social interactions, were consistent with the ALJ's RFC determination.

[19]Plaintiff also argues that the ALJ erred by failing to consider the factors set forth in 20 C.F.R. § 416.927(c)(2)-(6) for evaluating opinions from a treating source (Pl.'s Mem., at 17).  However, as noted above, while the ALJ must consider the factors, he "need not explicitly discuss" them.  Thompson v. Colvin, 12 Civ. 7024 (PAE)(HBP), 2014 WL 7392889 at *15 (S.D.N.Y. Dec. 29, 2014) (Engelmayer, D.J.) (adopting report and recommendation); accord Kaczkowski v. Colvin, 15 Civ. 9356 (GWG), 2016 WL 5922768 at *18 (S.D.N.Y. Oct. 11, 2016) (Gorenstein, M.J.) ("The failure to explicitly list each of these factors does not constitute legal error requiring remand where the ALJ applied the substance of the treating physician rule." (internal quotation marks omitted)).

his sparse work history "does not automatically equate with a conclusion that [plaintiff's] allegations of disability are not credible" (Pl.'s Mem., at 21).  Second, plaintiff argues that the ALJ's "bald statement that unspecified 'objective evidence' does not support [plaintiff's] statements regarding [his] disability is insufficient" (Pl.'s Mem., at 20).  Third, plaintiff argues that the ALJ made a conclusory finding that plaintiff had no restrictions in his activities of daily living and that even if that conclusory finding were true, "[n]one of [plaintiff's] activities of daily living are performed for sustained periods comparable to those required to hold a . . . job" (Pl.'s Mem., at 21 (ellipses in original; internal quotation marks omitted)).

The ALJ did not err by relying on plaintiff's sparse work history; indeed, the ALJ was required to consider it. Genier v. Astrue, supra, 606 F.3d at 49 (alterations and emphasis in original).

Notwithstanding this, the ALJ's credibility assessment is flawed.  As noted above, the ALJ was obligated to explain his decision to reject plaintiff's testimony "'with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief' and whether [the ALJ's] decision is supported by substantial evidence." Calzada v. Astrue, supra, 753 F. Supp. 2d at 280, quoting Fox v.

<u>Astrue</u>, <u>supra</u>, 2008 WL 828078 at *12; <u>see also</u> <u>Lugo v. Apfel</u>,
<u>supra</u>, 20 F. Supp. 2d at 664.  Here, in conclusory terms, the ALJ
stated that plaintiff's statements were inconsistent with "the
objective medical . . . evidence" without ever identifying the
objective medical evidence to which he was referring.  As ex-
plained in <u>Lugo v. Apfel</u>, <u>supra</u>, 20 F. Supp. 2d at 663-64,

> the ALJ's opinion makes no explicit or specific refer-
> ence to the [objective medical] evidence on which [he]
> relied in determining that plaintiff's claims of [the
> intensity, persistence and limiting effects of his
> claimed symptoms] were not credible . . . . Conclusory
> determinations such as these leave a reviewing court no
> basis on which to determine whether the proper factors
> were considered and the appropriate legal standards
> applied.

<u>Accord</u> <u>Bushansky v. Commissioner of Soc. Sec.</u>, 13 Civ. 2574
(JGK), 2014 WL 4746092 at *7-*8 (S.D.N.Y. Sept. 24, 2014) (Koelt-
l, D.J.).  Thus, "the ALJ failed to provide sufficient reasons
for review."  <u>Bushansky v. Commissioner of Soc. Sec.</u>, <u>supra</u>, 2014
WL 4746092 at *7.  "Even assuming the ALJ considered all the
relevant [objective medical] evidence and simply failed to
document that analysis, the credibility finding remains insuffi-
cient" because such an analysis "likely would be tainted here by
the ALJ's failure to properly evaluate the opinions of" Drs.
Pierce and Fruitman.  <u>Bunn v. Colvin</u>, No. 11-CV-6150 (NGG), 2013
WL 4039372 at *12 (E.D.N.Y. Aug. 7, 2013).

To the extent the ALJ provided reasons for his credibility assessment, they are insufficient.  Contrary to the ALJ's finding, plaintiff's activities of daily living are not "essentially unlimited."  Plaintiff testified that he had limited cooking skills and performed only basic cleaning (Tr. 38). Additionally, he had to lie down for two to three hours after taking his medications (Tr. 40).  Regarding those activities of daily living that plaintiff was able to perform, such as bathing, dressing, traveling independently and shopping with help (Tr. 21, 563), "there is no evidence that [plaintiff] engaged in any of these activities for sustained periods comparable to those required" by light work.  Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks omitted); accord Alfaro v. Colvin, No. 14-CV-4392, 2015 WL 4600654 at *11 (E.D.N.Y. July 29, 2015) ("[T]he ALJ erred in concluding that evidence of carrying on basic activities that do not require continuous sitting or standing showed [the claimant] could meet the requirements of sedentary work."); Glessing v. Commissioner of Soc. Sec., No. 13 Civ. 1254 (BMC), 2014 WL 1599944 at *11 (E.D.N.Y. Apr. 21, 2014).

Thus, the ALJ's credibility assessment was flawed, requiring remand.  The ALJ should reconsider his assessment in light of the objective medical record and the standards set forth above.

64

2.  ALJ's Analysis at
    Step Five: Plaintiff's
    Ability to Work

        Plaintiff also challenges the ALJ's conclusion that
plaintiff could perform work that exists in significant numbers
in the national economy.  Specifically, plaintiff contends that
he has significant nonexertional limitations, namely, difficul-
ties in social functioning and in concentration, persistence and
pace; he argues that, pursuant to SSR 85-15, 1985 WL 56857 (Jan.
1, 1985), reliance on the Grids was, therefore, improper.
Plaintiff contends that his nonexertional limitations required
the ALJ to secure the testimony of a vocational expert before
determining whether plaintiff was disabled (Pl.'s Mem., at 23-
24).

        The Commissioner responds that the ALJ's reliance on
the Grids was proper because (1) "the ALJ's step three finding
that Plaintiff had moderate limitations in social functioning and
concentration, persistence or pace need not be explicitly in-
cluded in the RFC determination"; (2) plaintiff's moderate
limitations in concentration, persistence or pace were taken into
consideration by the ALJ in assessing plaintiff's RFC; (3)
plaintiff's "ability to perform simple, routine, repetitive
tasks, and the ability to understand, remember and carry out

65

simple instructions and make simple work-related decisions . . .
encompasses the basic mental demands of unskilled work," as
outlined in SSR 85-15, supra, 1985 WL 56857, and (4) SSR 85-15
indicates that a limitation to unskilled work ordinarily involves
dealing with objects, not people, and does not significantly
erode the occupational base for work (Def.'s Mem., at 24-25).

First, although the ALJ found that plaintiff had
moderate difficulties in social functioning and concentration,
persistence or pace at step three (Tr. 21-22), that is not
necessarily inconsistent with the ALJ's RFC assessment at step
four and his finding at step five that plaintiff's limitations
had little to no effect on the occupational base of unskilled
light work.  See McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir.
2014); Avant v. Colvin, No. 6:15-cv-6671 (MAT), 2016 WL 5799080
at *3 (W.D.N.Y. Oct. 5, 2016) (analysis at step three "assesses
the functional effects of a claimant's mental impairments, but it
is entirely separate and analytically distinct from, a subsequent
determination of mental residual functional capacity[,] where the
focus is on an assessment of an individual's ability to do
sustained work-related physical and mental activities in a work
setting on a regular and continuing basis" (alteration and
emphases in original; internal quotation marks and citations

omitted)); <u>Jimenez v. Colvin</u>, 12 Civ. 6001 (PGG)(FM), 2016 WL 5660322 at *12 (S.D.N.Y. Sept. 30, 2016) (Gardephe, D.J.)

However, as explained above, <u>see</u> <u>supra</u> Section III.A.2, exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work."[20] <u>Bapp v. Bowen</u>, <u>supra</u>, 802 F.2d at 603; <u>accord</u> <u>Butts v. Barnhart</u>, <u>supra</u>, 388 F.3d at 383-84.  Where nonexertional limitations are claimed, and before the ALJ relies exclusively on the Grids, the ALJ must first "consider the intermediate question -- whether the range of work [a claimant] could perform was so significantly diminished as to require the introduction of vocational testimony." <u>Bapp v. Bowen</u>, <u>supra</u>, 802 F.2d at 606.  If the answer to that question is affirmative, the ALJ cannot rely on the Grids alone and must secure the testimony of a vocational expert to determine whether the claimant is disabled.

The principal problem in this case is that the ALJ failed to address the "intermediate question" set forth in <u>Bapp</u> -- whether plaintiff's nonexertional limitations significantly

_____

[20]While the ALJ noted that plaintiff's physical impairments were exertional (Tr. 24), he did not note whether any of his impairments were nonexertional.  Plaintiff's mental impairments appear to be nonexertional because there is no evidence (and no reason to believe) that they affect his ability to sit, stand, walk, lift, carry, push or pull.  20 C.F.R. § 416.969a(b).

diminished his ability to perform the basic mental demands of unskilled work -- and went instead directly to the Grids to determine whether plaintiff was disabled.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).  As in Bapp v. Bowen, supra, 802 F.3d at 603 (internal quotation marks omitted), in which the ALJ concluded that "claimant's capacity for the full range of light work has not been significantly compromised by his additional nonexertional limitations," ALJ Friedman noted that "the addi-tional limitations have little or no effect on the occupational base of unskilled light work" (Tr. 25-26).  As in Bapp v. Bowen, supra, 802 F.3d at 606, the ALJ made this determination "in the context of the ultimate question, i.e. was [plaintiff] disabled" and failed to consider whether vocational expert testimony was needed.  The ALJ's failure to consider the intermediate question was legal error, requiring remand.  See Bapp v. Bowen, supra, 802 F.2d at 606; DeLeon v. Colvin, No. 3:15-CV-1106 (JCH), 2016 WL 3211419 at *5 (D. Conn. June 9, 2016); Hernandez v. Colvin, 13 Civ. 3035 (RPP), 2014 WL 3883415 at *15 (S.D.N.Y. Aug. 7, 2014) (Patterson, D.J.) ("Although an ALJ has discretion to conclude that the Grid adequately addresses a plaintiff's non-exertional impairments, courts in this Circuit have held that the ALJ is obligated to explain such a finding."); Westcott v. Colvin, No. 12-CV-4183 (FB), 2013 WL 5465609 at *4 (E.D.N.Y. Oct. 1, 2013)

(on remand, "before applying the Grids, the ALJ must first analyze whether their application is appropriate"); Bunn v. Colvin, supra, 2013 WL 4039372 at *10 (ordering the ALJ, on remand, "to determine whether the Commissioner has shown that [the claimant's] ability to perform the full range of light, unskilled work is not significantly diminished as a result of his nonexertional impairments"); Cruz v. Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040 at *19 (S.D.N.Y. July 2, 2013) (Peck, M.J.) (Report & Recommendation) ("If [the ALJ] treated the Grid as dispositive because he found that [the claimant's] nonexertional limitations did not significantly reduce, or only had a negligible impact on, [the claimant's] work capacity, [the ALJ] was obligated to explain that finding."), adopted by, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014) (Crotty, D.J.); Aas v. Astrue, No. 08-CV-4488 (DLI), 2010 WL 3924687 at *11 (E.D.N.Y. Sept. 29, 2010).

The Commissioner's arguments are unavailing. First, to the extent the Commissioner's arguments can be read as asserting that the ALJ made an implicit finding that plaintiff's nonexertional limitations did not significantly diminish plain-tiff's ability to work, the argument is not convincing. If plaintiff had nonexertional limitations that, in the ALJ's opinion, did not significantly diminish his ability to work, the

ALJ had an obligation to explain how he reached his conclusion, and his failure to do so is plain error.  St. Louis ex rel. D.H. v. Commissioner of Soc. Sec., 28 F. Supp. 3d 142, 148 (N.D.N.Y. 2014); Baron v. Astrue, 11 Civ. 4262 (JGK)(MHD), 2013 WL 1245455 at *19 (S.D.N.Y. Mar. 4, 2013) (Dolinger, M.J.) (Report & Recom-mendation), adopted by, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013) (Koeltl, D.J.); accord Lewis v. Astrue, 11 Civ. 7538 (JPO), 2013 WL 5834466 at *22 (S.D.N.Y. Oct. 30, 2013) (Oetken, D.J.) ("Cour-ts in this Circuit have long held that an ALJ's failure to acknowledge relevant evidence or to explain its implicit rejec-tion is plain error." (internal quotation marks omitted)); Camilo v. Commissioner of Soc. Sec. Admin., 11 Civ. 1345 (DAB)(MHD), 2013 WL 5692435 at *15 (S.D.N.Y. Oct. 2, 2013) (Batts, D.J.) (adopting report and recommendation).

Second, the Commissioner's and the ALJ's (along with plaintiff's) citation to SSR 85-15 is erroneous.  SSR 85-15, supra, 1985 WL 56857, applies only where the claimant suffers solely from nonexertional impairments; as noted in footnote 20, plaintiff here also suffers from exertional impairments.  Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012) (summary order) ("SSR 85-15, descriptively titled 'The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments,' does not apply to a case, such as this one, in which the claimant

70

suffers from a combination of exertional and non-exertional impairments." (emphasis in original)).  Whether plaintiff's nonexertional impairments, by themselves, warrant a finding of disability does not resolve the question of whether all of plaintiff's impairments, taken together, warrant a finding of disability.  See Burgin v. Astrue, 348 F. App'x 646, 647 (2d Cir. 2009) (summary order) ("The Commissioner is required to 'consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity' to establish eligibility for Social Security benefits" (alteration in original)), citing 20 C.F.R. § 404.1523; Baron v. Astrue, supra, 2013 WL 1245455 at *21.

Accordingly, on remand, the ALJ should re-evaluate whether the Commissioner has shown that plaintiff's capability to perform the full range of unskilled light work was not significantly diminished by his physical and mental limitations.  While this initial determination need not require a vocational expert, if the ALJ determines that plaintiff's nonexertional limitations significantly diminish his ability to perform the full range of unskilled light work, then the ALJ must secure the testimony of such an expert.

IV.   Conclusion

       Accordingly, for all the foregoing reasons, plaintiff's motion for judgment on the pleadings is granted.  The Commissioner's motion is denied, and this case is remanded to the SSA for further proceedings.  The Clerk of the Court is respectfully requested to close Docket Items 11 and 14.

Dated:  New York, New York
       February 28, 2017

                         SO ORDERED

                         HENRY PITMAN
                         United States Magistrate Judge

Copies transmitted to:

All Counsel of Record